UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-10125

PETER J. MULHERN, Trustee of Hermes Realty Trust,
and HABIT OPCO, INC.

v.

PHILADELPHIA INDEMNITY INSURANCE COMPANY

MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR
PARTIAL SUMMARY JUDGMENT

August 15, 2011

STEARNS, D.J.

The case arises from defendant Philadelphia Indemnity Insurance Company's

(Philadelphia Indemnity's) denial of coverage for structural damage sustained by a

building (Building) leased to Habit OPCO, Inc. (Habit).  The damage is alleged to have

been caused by construction at an adjacent site owned by Greater Boston Food Bank

(GBFB).[1]  On January 27, 2010, Habit and Peter J. Mulhern, as trustee of Hermes

Realty Trust and owner of the property (Property) on which the Building is located,

brought this diversity action in the district court claiming breach of contract (Count I),

and a violation of the Massachusetts Unfair or Deceptive Practices Act, Mass. Gen.

---

[1] Habit is a substance abuse treatment facility located on Topeka Street in the
Roxbury section of Boston, Massachusetts.

Laws ch. 93A, § 11 (Count II). The parties filed cross-motions for partial summary judgment as to Count I on October 15, 2010. A hearing on the motions was held on January 11, 2011.

## BACKGROUND

The material facts, in the light most favorable to the respective nonmoving parties, are as follows. In the early 1900s, portions of the Property were seasonally submerged. In 1931, the land surface was shored up with a layer of "urban fill."[2] When the Building leased to Habit was constructed, its exterior walls and interior column piers were buttressed with concrete piles driven deep enough into the earth to carry the Building's weight. The floor was made of concrete slabs 4-6 inches thick and supported by pile caps, which were spaced between 12 to 25 feet apart. Each pile cap rested on 2-3 piles, spaced 1.3 to 1.5 feet apart. In the gaps between the pile caps and the exterior foundation walls, the concrete slabs were supported by 2-4 feet of urban

---

[2] The urban fill was composed of sand, gravel of varying sizes, and trace amounts of cinder, brick, and ash. Stipulation of Facts ¶ 19(a). The parties are in fierce disagreement over the density of the layer of urban fill beneath the concrete floor slabs of the Building. Mulhern states that when he purchased the Property in 1983, "the soil was densely packed right up to the level of the concrete floor slabs." Mulhern Aff. ¶ 6. On October 15, 2010, the parties stipulated that an investigation and analysis conducted by geotechnical engineer Wayne McArdle revealed that "[t]he urban fill is considered loose to very loose." Stipulation of Facts ¶ 19(a). However, on November 15, 2010, McArdle submitted a seemingly conflicting affidavit stating that "the top four feet of fill was densely compacted." McArdle Aff. ¶ 4.

fill.

In 1997, Mulhern converted the Building from a warehouse to a patient care facility and leased it to Habit. During the reconstruction, the concrete floor slabs were leveled, partition walls were erected, and a suspended ceiling system was installed. On October 27, 2007, Habit purchased a Commercial Lines Policy (Policy) from Philadelphia Indemnity to insure the Building against structural damage. The Policy ran from October 27, 2007 to October 27, 2008, and listed Mulhern as a loss payee.

On December 7, 2007, GBFB began construction of a new facility on property adjacent to Habit. The work required the sinking of concrete piles into the GBFB property. Between December of 2007 and mid-March of 2008, the builders drove 288 concrete piles to depths of almost 190 feet.

Habit employees first noticed signs of structural damage sometime between December 19, 2007, and January 17, 2008; however, the extent of the damage is disputed.[3] The parties agree only that two door frames had cracked where the door jamb met the header and that some Building walls and sections of the clinic floor were

---

[3] Although plaintiffs now maintain that the Building suffered no structural damage in January of 2008, *see* Pls.' Reply to Def.'s Statement of Facts (SOF) at 2, on October 14, 2008, plaintiffs' counsel, Valerie Pawson, wrote a letter to the City of Boston Inspection Services Department stating that "Habit OPCO employees reported to the GBFB that the building was sustaining significant damage from the pile driving in mid-January 2008." Def.'s SOF ¶ 12.

no longer level. Philadelphia Indemnity also acknowledges that "[t]hese conditions did not exist before the pile driving began on the GBFB Property." Stipulation of Facts ¶ 14. Habit complained on at least two occasions to the subcontractor responsible for the pile driving, who investigated and photographed the damage.

According to plaintiffs, on February 1, 2008, "the Building was hit by pile driving vibrations that were likely triple or more the federal damage threshold."[4] *Id.* By mid-February, Habit's entrance hallway and its "motivation" room were showing distinct floor heaves, while the ceiling tiles were shifting and additional walls had begun cracking. On February 29, 2008, Habit wrote to Mulhern to complain about the structural damage. On March 11, 2008, Habit's insurance broker formally notified Philadelphia Indemnity of the claim. Philadelphia Indemnity began an investigation. It hired McArdle Gannon Associates, Inc. (McArdle), to perform an analysis and recommend remedial steps. The investigation revealed

> movement, heaving and cracking of the concrete floor slab, movement and separation of the interior partition walls from the concrete floor slab, upward movement of the suspended ceiling system attached to partition walls, and the distortion of door frames. The Building's masonry block walls and interior columns (both of which were set on piles) did not

---

[4] Engineers on the GBFB Property "recorded a peak sum velocity of 4.03 inches per second at a frequency between 7 and 8 Hz. The U.S. Bureau of Mines threshold for vibration damage to adjacent structures at a frequency of between 7 and 8 Hz is a peak sum velocity of below 1.0 inches per second." Pls.' Mot. for Summ. J. at 2 (citing Pls.' SOF ¶ 37, 78).

sustain any damage.

Stipulation of Facts ¶ 17.  McArdle determined that

> vibrations from pile driving on the GBFB Property traveled through the
> ground and caused alterations to the layer of urban fill and organic
> deposits beneath the Building's concrete floor slabs.  This, in turn, caused
> the Building's concrete floor slab to lose its structural support in areas not
> supported by pile caps.  Without that support, the concrete floor slabs
> shifted, settled and developed structural cracks.   As the floor slabs
> settled, the Building's interior partition walls (built atop the slabs), its
> suspended ceiling system and door frames also moved and sustained
> structural damage.

*Id.* ¶ 20.  McArdle's final report concluded that "pile driving operations directly

adjacent to the site for the Greater Boston Food Bank Project [are] primarily

responsible for the floor slab settlement experienced to date."  Am. Compl. ¶ 20.

McArdle estimated the cost of repair of the subsurface damage at $1,200,000,

exclusive of reconstruction costs.  McArdle warned that any short term repair, such as

slab jacking, would only mask the underlying problems.[5]

On July 7, 2008, Habit filed a claim by email with Philadelphia Indemnity after

the three-year-old rubber roof of the Building developed a split of .75 inches along forty

feet of its center.  The split compromised the nearby storm drains.  Habit also reported

_____

[5] On October 20, 2008, plaintiffs met with Philadelphia Indemnity's engineer to
discuss the defendant's proposal to slab jack the Building to level the floor.  Plaintiffs
rejected the proposal as an inadequate response by the insurer on the basis of the
McArdle report's warning that short-term fixes, like slab jacking, would require
ongoing maintenance over the life of the Building.

water bubbling up through the floor near the dispensary. Habit repaired the roof immediately, although the expense was out-of-pocket because the effects of the GBFB construction had voided the roof's warranty. On July 21, 2008, Habit filed another claim by email when a different portion of the roof cracked, leading to severe flooding that forced Habit to shut down patient counseling sessions for the day. Habit again made immediate repairs at a cost of $115,000 to keep the clinic open.

On November 24, 2008, Philadelphia Indemnity issued a check in the amount of $30,000 to compensate for water damage as of a "loss" date of July 20, 2008. On December 15, 2008, Philadelphia Indemnity denied the claim for structural damage, citing the Policy's "Earth Movement" exclusion. The exclusion states:

> 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss . . . .
>
>     b. Earth Movement
>
>         (1) Earthquake, including any earth sinking, rising or shifting related to such event;
>
>         (2) Landslide, including any earth sinking, rising or shifting related to such event;
>
>         (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased
>
>         (4) Earth sinking (other than sinkhole collapse), rising or

shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, described in b.(1) through (4) above, results in fire or explosion, we will pay for the loss or damages caused by that fire or explosion.

## DISCUSSION

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986). The interpretation of an insurance contract and the application of relevant policy language to established facts present questions of law for the trial judge. *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 439 Mass. 387, 394 (2003). It is well settled that "[w]here . . . there is more than one rational interpretation of [insurance] policy language, the 'insured is entitled to the benefit of the one that is more favorable to it.' . . . This rule of construction applies with particular force to exclusionary provisions." *Hakim v.*

*Mass. Insurers' Insolvency Fund*, 424 Mass. 275, 280-282 (1997), quoting *Trs. of Tufts Univ. v. Commercial Union Ins. Co.*, 415 Mass. 844, 849 (1993).

### *Statute of Limitations*

Philadelphia Indemnity moves initially for partial summary judgment on grounds that the Complaint is barred by the two-year Massachusetts statute of limitations on insurance contract actions. Under Massachusetts law, a suit must be brought "within two years from the time the [insurance] loss occurred." Mass. Gen. Laws ch. 175, § 99. Philadelphia Indemnity argues that although the term "loss" is not defined by the Policy or the statute, courts have consistently held that a "loss" occurs on the date of "the fire or incident causing the damage to the property." *Nunheimer v. Cont'l Ins. Co.*, 68 F. Supp. 2d 75, 78 (D. Mass. 1999). Philadelphia Indemnity contends that because the damage caused by the pile driving became apparent to Habit employees no later than January 17, 2008, the "loss" occurred more than two years before the lawsuit was filed on January 27, 2010.

Plaintiffs, for their part, argue that the loss did not occur until February 1, 2008, when a sudden escalation of the pile driving "sent shock waves through the soil." Pls.' Reply Mem at 1. Although plaintiffs concede that some damage was noticeable by mid-January of 2008, they insist that it did not become "appreciable" until after the February 1, 2008 shock waves began.

Given the gradual accumulation of damage during the three and one-half months of the pile driving, establishing the exact date of the loss is not as simple a task as the parties respectively contend. As a fallback position, plaintiffs urge that the court adopt Judge Boudin's approach in interpreting a similar Connecticut statute of limitations in an earlier First Circuit case. In *Parker v. Worcester Ins. Co.*, 247 F.3d 1 (1st Cir. 2001), the insured, in March of 1996, noticed that decade-old hairline foundation wall cracks had grown larger and developed a sandy texture. She arranged for a professional inspection, but she did not notify the insurer of the deteriorating condition until September of 1996. No demand letter was sent until November of 1997. While acknowledging the strictness of Connecticut's one-year statute of limitations, Judge Boudin agreed with the district court "that, in the case of a non-obvious injury or loss, the [limitations] period begins to run only when a reasonable person would have learned of the injury or loss." *Id.* at 4.

Like Connecticut, Massachusetts tempers the harshness that results from a rigid application of a statute of limitations by incorporating a discovery rule. Under this rule, a limitations period begins to run only when events occur or facts surface which would cause a reasonably prudent person to become aware that he or she had been harmed. *Felton v. Labor Relations Comm'n*, 33 Mass. App. Ct. 926, 927 (1992). *See also Loguidice v. Metro. Life Ins. Co.*, 336 F.3d 1, 6, (1st Cir. 2003). "[T]he question when

a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact." *Riley v. Presnell*, 409 Mass. 239, 240 (1991). As Judge Boudin explained in *Parker*,

> even if the facts were undisputed, a reasonable factfinder could draw varying conclusions as to whether a reasonable person should have known from these facts that a substantial structural flaw was present or at least likely. A judgment on undisputed facts that a reasonable person 'should have known' something is (like negligence) a legal conclusion; but it is one of those conclusions that most courts leave to juries where, as here, reasonable juries could differ.

*Parker*, 247 F.3d at 5. So it is here as well. Whether Habit should have known that the visible cracks in the door frames and the shifting of the walls and floors were the incipient signs of substantial structural damage is an issue of fact for the jury to decide.

### *"Earth Movements" Policy Exclusion*

Whether an insurance claim is covered or excluded by a policy is a question of law to be resolved by the court. *B & T Masonry Constr. Co., Inc. v. Pub. Serv. Mut. Ins. Co.*, 382 F.3d 36, 38 (1st Cir. 2004). The court will construe the policy "'according to the fair and reasonable meaning of its words,' interpret exclusionary clauses against the insurer, and resolve all ambiguities against the insurer." *U.S. Aviation Underwriters, Inc. v. Fitchburg-Leominster, Flying Club, Inc.*, 42 F.3d 84, 86 (1st Cir. 1994) (citation omitted). The insurer bears the burden of establishing the applicability of any exclusion. *Mt. Airy Ins. Co. v. Greenbaum*, 127 F.3d 15, 19 (1st

Cir. 1997).

Philadelphia Indemnity argues that as a matter of law, the structural damage caused by GBFB's pile driving falls within the Policy's "Earth Movements" exclusion. Plaintiffs, for their part, contend that the damage is covered by the Policy because the "Earth Movements" exclusion should be read to bar only coverage of naturally occurring earth movements and not man-made events.

The Policy contemplates four types of excluded earth movements: earthquake, landslide, mine subsidence (defined as subsidence of a man-made mine, whether or not mining activity has ceased), and earth sinking. Policy B.1.b. Earth sinking is defined as follows:

> [e]arth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, *improperly compacted soil* and the action of water under the ground surface.

*Id.* at B.1.b.(4) (emphasis added). "[I]mproperly compacted soil" is clearly a man-made condition, which the plain language of the Policy excludes from coverage. Therefore, the Policy is not ambiguous in this respect. *See Ruede v. Florence*, 220 P.3d 113, 117 (Or. App. 2009) ("The problem is that plaintiffs' argument cannot be squared with the text of the exclusion, which lists at least one human-created cause – 'improperly compacted soil' – among the excluded 'soil conditions.'"). Where the

terms of an exclusionary clause are plain and free from ambiguity, the words will be construed in their ordinary sense and will not be strictly construed against the insurer. *Farm Family Mut. Ins. Co. v. Whelpley*, 54 Mass. App. Ct. 743, 745 (2002). Such is the case here. Philadelphia Indemnity is entitled to judgment only to the extent that Habit is precluded from arguing that the Policy covers damages caused by defects in the urban fill.

Philadelphia Indemnity next argues that the "anti-concurrent cause" provision in the "Earth Movement" exclusion precludes coverage under plaintiffs' theory that shock waves generated by the pile driving and not "improperly compacted soil" caused the structural damage to the Building. In this regard, Philadelphia Indemnity relies on the Policy language excluding coverage for damage caused directly or indirectly by "soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty." Policy B.1.b.(4). Defendants point to the parties' stipulation that

> vibrations from pile driving on the GBFB Property traveled through the ground and caused alterations to the layer of urban fill and organic deposits beneath the Building's concrete floor slab. This, in turn, caused the Building's concrete floor slab to lose its structural support in areas not supported by pile caps. Without that support, the concrete floor slabs shifted, settled and developed structural cracks.

Stipulation of Facts ¶ 20.

There is some support for the proposition that under Massachusetts law, an "anti-concurrent cause" provision in an insurance contract bars coverage for damage that results directly or indirectly from an excluded clause, regardless of whether covered acts also contribute to the damage. *See Jussim v. Mass. Bay Ins. Co.*, 415 Mass. 24, 27, 30-31 (1993); *Alton v. Mfrs. & Merchs. Mut. Ins.* Co., 416 Mass. 611, 614-615 (1993); *Driscoll v. Providence Mut. Fire Ins. Co.*, 69 Mass. App. Ct. 341, 347 (2007). But here, there is a material dispute of fact as to whether "improperly compacted soil" was the cause of the damage or whether vibrations emanating from the pile driving were the exclusive cause. This is an issue of fact for the jury to resolve.

### *Additional Coverage for Collapse*

In Massachusetts, the insured bears the burden of establishing coverage. *See St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195, 1200 (1st Cir. 1994). Under an alternative theory of coverage, plaintiffs argue that the damage caused by the GBFB pile driving falls under the "Additional Coverage - Collapse" section of the Policy. Under plaintiffs' definition of the meaning of a "collapse," all damages for loss of the roof and the resulting water damage, including the damage to the concrete floor slabs, were caused by a collapse.

The "Additional Coverage - Collapse" section of the Policy, however, states that "[c]ollapse means an abrupt falling down or caving in of a building or any part of a

building with the result that the building cannot be occupied for its intended purpose."[6]

Philadelphia Indemnity contends, and the court agrees, that plaintiffs have not met their burden of proving coverage under this section of the Policy. Plaintiffs' own characterization of the damage was that on July 7, 2008, the Building's roof "split, leaving a gap of .75 inches." Pls.' SOF ¶ 59. On July 21, 2008, the damage was compounded when "the roof at the Clinic cracked open in the area facing the South Bay Avenue." *Id.* ¶ 63. Neither claim constitutes an "abrupt falling down or caving in" as required by the Policy.[7]

## ORDER

For the foregoing reasons, the parties' motions for partial summary judgment as to Count I are <u>DENIED</u>. However, the case will be tried consistent with the court's rulings of law as reflected in this decision. The Clerk will now assign the case a trial date.

## SO ORDERED.

---

[6] The Policy goes on to state that the insurer will pay for direct physical loss or damage caused by collapse of a building or any part of a building if the collapse is caused, as alleged in this case, by "weight of rain that collects on a roof." Policy D.2.e.

[7] The Policy clarifies that "[a] building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." Policy D.1.d.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE